UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/31/21
```

EIG Credit Management Company, LLC,

Plaintiff,

–v–

CNX Resources Corporation,

Defendant.

20-cv-2887 (AJN)

MEMORANDUM
OPINION & ORDER

ALISON J. NATHAN, District Judge:

In this diversity action, Plaintiff, a financial services company, brings claims for breach of contract arising out of a preliminary agreement to obtain financing for Defendant. Defendant filed an Answer and asserted counterclaims for breach of contract on the grounds that Plaintiff had a duty to negotiate in good faith and breached that duty, as well as counterclaim for breach of the implied covenant of good faith and fair dealing. Plaintiff filed a motion to dismiss Defendant's counterclaims for failure to state a claim under Fed. R. Civ. P. 12(b)(6), as well as a motion to strike Defendant's jury demand. For the reasons that follow, the motion to dismiss is GRANTED IN PART and DENIED IN PART. The motion to strike the jury demand is GRANTED on consent.

## I.    BACKGROUND

### A.  Factual Background

The following facts are drawn from the Complaint (to the extent not disputed by Defendant), Defendant's Answer, and Defendant's Amended Counterclaims, and the attached exhibits thereto. Dkt. Nos. 1, 16, 32. In 2019, Defendant CNX Resources Corporation, a natural gas company, began negotiations with Plaintiff EIG Credit Management Company LLC, a

financial services company, regarding a potential financing arrangement wherein CNX would issue and sell Senior Secured 2nd Lien Notes to EIG Funds. Dkt. No. 1 ¶ 9. CNX informed EIG from the beginning that the purpose of this arrangement was for CNX to obtain liquidity that would give it the financial flexibility to buy back stock and/or bonds in the event that market conditions were favorable or at a time when it was in the company's best interest to do so. Dkt No. 32 ¶ 17.

The negotiation and due diligence process began in early November. On October 31, 2019, the parties executed a confidentiality agreement with the purpose of permitting EIG to obtain information from and about CNX so it could evaluate and prepare for the proposed transaction. *Id.* ¶ 12. EIG then began substantial due diligence. *Id.* ¶¶ 13-14. During this period, the parties negotiated and prepared a basic framework for the financing with the fundamental terms for the arrangement. *Id.* ¶¶ 15-16. These were later memorialized in a document called "Indicative Terms." *Id.*

On November 26, 2019, the parties executed a "Mandate Agreement," which was a preliminary agreement to conduct due diligence and negotiations with the objective of later finalizing a contract to provide financing. Dkt. No. 1 ¶ 2. The Agreement provides that EIG shall have "the exclusive mandate . . . regarding a potential financing" with CNX, "more fully described in the Indicative Terms," which "generally describes certain material terms and minimum conditions under which [CNX] and EIG . . . seek to execute the Financing." Dkt. No. 8-1. The Indicative Terms, which were thus incorporated by reference into the Mandate Agreement, were finalized the same day in a document that laid out a series of basic terms and conditions for the potential financing arrangement. Dkt. No. 23-1. (The Court refers to the Mandate Agreement and Indicative Terms jointly as "the Agreement.") The Indicative Terms

document states that "[t]his Summary of Indicative Terms and Conditions is intended as a proposal for discussion purposes only and should not be construed as a commitment. No commitment or obligation hereunder shall exist until such time as the parties enter into a commitment letter or definitive documentation for the financing contemplated herein. The pricing and terms included herein are based on market conditions on the date hereof and are subject to change." Dkt. No. 23-1.

Additionally, the Mandate Agreement states that it "does not constitute a commitment of EIG . . . to provide, participate in or otherwise arrange for the Financing or any Alternative Financing," and clarifies that "[a]ny future commitment from EIG . . . will be issued only in writing." Dkt. No. 8-1.

CNX had various obligations under the Agreement. First, CNX was not permitted to seek out a potential financing arrangement with anyone other than EIG during the "exclusivity period." *Id.* This provision gave EIG the exclusive right to seek to provide financing to CNX until (1) a deal was reached, (2) February 1, 2020, or (3) a date mutually agreed upon by the parties, whichever came first. *Id.* Additionally, CNX was to pay all "reasonable and documented out-of-pocket costs and expenses of EIG" in seeking out a potential financing arrangement, including fees of legal counsel and other consultants, regardless of whether any deal was reached, though this amount was capped at $750,000. *Id.* CNX also had to agree to indemnify EIG for any claims arising out of the Agreement, including attorney's fees. *Id.*

Additionally, the Agreement contained New York choice-of-law and forum-selection clauses, as well as a waiver of a right to a jury trial, which applied equally to both parties. *Id.* Lastly, the Agreement stated that "This Agreement (including the Indicative Terms) constitute

the entire agreement between the Parties with respect to the subject matter of this Agreement and may not be amended except by written agreement signed by both Parties." *Id.*

After the Agreement was executed, the parties engaged in further due diligence and negotiations. Both parties incurred substantial costs and expenses during this period. Dkt. No. 32 ¶ 41. By January 14, 2020, the parties had begun to draft final closing documents for a financing arrangement that was in line with the Indicative Terms. *Id.* ¶ 40. But, on or around January 26, 2020, EIG informed CNX that it was making material changes to the terms of the financing arrangement, including prohibiting stock buybacks and note repurchases, altering financing amounts, adding reporting requirements, and increasing the coupon on the bond by 5%, all of which CNX alleges EIG knew were "non-starters" from the beginning. *Id.* ¶ 59. EIG claims that the changes were made due to the fluctuations in the natural gas market, which in turn decreased the value of CNX's publicly traded debt, but CNX responds that the natural gas market was constantly in flux, and that the value of its publicly traded debt was not materially different than when the parties entered into the Agreement. *Id.* EIG never informed CNX prior to January 24, 2020 that the market fluctuations or changes in the value of CNX's publicly traded debt during that period were a concern or that the terms the parties had been negotiating for two months were unacceptable. *Id.* ¶¶ 57–61. CNX did not accept the deal.

CNX alleges that, as a result of EIG's conduct, it incurred $638,393 in fees and expenses during the due diligence, negotiation, and document drafting process, as well as $74,338.40 in labor costs. *Id.* ¶¶ 90-91. CNX also alleges that EIG caused CNX to lose out on other financing opportunities, as it had been approached by EIG competitors prior to entering into the Agreement, and CNX's competitors had been able to obtain financing on similar or even more favorable terms during this period. *Id.* ¶ 93. Specifically, CNX alleges that, had it obtained

financing, it would have been able to purchase its $500 million in 2027 bonds at the then-available price of 52% of face value on March 9, 2020, and then on March 12, 2020, all of its $300 million in 2022 bonds at the then-available price of 79.904% of face value.  *Id.* ¶¶ 98-99. Overall, CNX alleges it would have saved over $300 million from these opportunities.  *Id.*

### B.  Procedural Background

On April 7, 2020, EIG filed a Complaint against CNX for breach of contract arising out of CNX's refusal to pay EIG for the costs it incurred during the due diligence and negotiation process.  Dkt. No. 1.  On May 25, 2020, CNX filed an Answer, asserting various defenses, and brought counterclaims against EIG.  Dkt. No. 16.  After EIG brought a motion to dismiss CNX's counterclaims, CNX filed an amended counterclaim on July 2, 2020.  Dkt. No. 32.  CNX asserts counterclaims for breach of contract and breach of the implied covenant of good faith and fair dealing.  *Id.*  On July 16, 2020, EIG moved to dismiss CNX's amended counterclaims for failure to state a claim under Fed. R. Civ. P. Rule 12(b)(6) and to strike CNX's jury demand, and that motion is now fully briefed.  Dkt. No. 33.

## II.    DISCUSSION

Plaintiff moves to dismiss Defendant's counterclaim for breach of contract.  In order "[t]o survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief."  *Johnson v. Priceline.com, Inc.,* 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555–56 (2007)).

In determining the "adequacy of the complaint, the court may consider any written instrument attached to the complaint as an exhibit or incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint," *Subaru Distributors Corp. v. Subaru of Am., Inc*., 425 F.3d 119, 122 (2d Cir. 2005), including

here the parties' Agreement.  While the Court is not "not obliged to accept the allegations of the complaint as to how to construe" the Agreement, "at this procedural stage, [the Court] should resolve any contractual ambiguities in favor of the plaintiff." *Id.*  The "question of whether a written contract is ambiguous is a question of law for the court" under New York law.  *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009).  Additionally, "[if] the contract is unambiguous, its meaning is likewise a question of law for the court to decide." *Id.* at 397 (citing *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000)).  The Court may therefore resolve issues of contract interpretation as a matter of law upon a motion to dismiss if the language is unambiguous.

Under New York law,[1] for a breach of contract claim to survive a motion to dismiss "a complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996).

### A.  Breach

The first question is whether CNX has alleged that EIG breached any of its obligations under the contract.  CNX maintains that, under the Agreement, EIG had a duty to negotiate in good faith, and that it breached this duty.

### 1.  The Agreement Contained a Duty to Negotiate in Good Faith

The purpose of the Agreement between EIG and CNX was to seek out a potential financing package.  When parties enter into a preliminary agreement to achieve some further objective, the issue arises "as to whether . . . [it] is a binding contract or an unenforceable

---

[1] The Court applies New York law to this dispute because "the parties' briefs assume that New York substantive law governs the issues . . . presented here, and such implied consent is, of course, sufficient to establish the applicable choice of law." *Nat'l Union Fire Ins. Co. of Pittsburg v. Beelman Truck Co.*, 203 F. Supp. 3d 312, 317 (S.D.N.Y. 2016) (alteration in original) (quoting *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009)).

agreement to agree." *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 547 (2d Cir. 1998).

The Second Circuit has held that, under New York law, certain kinds of preliminary contracts are binding in the sense that they create an obligation to negotiate open terms in good faith, even if there is no express term requiring the parties do so, and even if the parties are not bound to ultimately come to an Agreement on the final terms. *See Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir. 1989). In particular, if parties enter into a "preliminary agreement" where they "have committed themselves to some major terms, but some terms will remain to be negotiated," the parties may be deemed to have "accept[ed] a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement." *Id.* The Second Circuit has referred to this type of preliminary agreement as a "Type II" agreement, whereas a "Type I" agreement refers to preliminary agreements in which the parties have agreed to all terms that require negotiation but have not finalized the agreement in a formal writing yet. *See Brown v. Cara*, 420 F.3d 148, 153 (2d Cir. 2005).

Importantly, a Type II agreement does not "commit the parties to their ultimate contractual objective," but rather "to the obligation to negotiate the open issues in good faith in an attempt to reach the alternate objective within the agreed framework." *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987). While a party to this type of contract may not "demand performance of the transaction," they may demand that the "counterparty negotiate the open terms in good faith toward a final contract incorporating the agreed terms." *Id.* "[I]f a final contract is not agreed upon, the parties may abandon the transaction as long as they have made a good faith effort to close the deal and have not insisted

on conditions that do not conform to the preliminary writing." *Adjustrite*, 145 F.3d at 548.  But

"if the preliminary writing was not intended to be binding on the parties at all, the writing is a

mere proposal, and neither party has an obligation to negotiate further." *Id.*

Though courts must be careful not to "trap[] parties in surprise contractual obligations

that they never intended," *Brown*, 420 F.3d at 156–57, enforcing such preliminary agreements to

negotiate in good faith serves an important purpose.  If courts did not enforce these types of

contracts, then "parties would be obliged to expend enormous sums negotiating every detail of

final contract documentation before knowing whether they have an agreement, and if so, on what

terms." *Tribune*, 670 F. Supp. at 499.  These preliminary agreements allow the parties "to

negotiate a general framework within which they [can] proceed while preserving flexibility in

the face of future uncertainty." *Brown*, 420 F.3d at 158.

In deciding if a binding preliminary agreement exists, courts are "to enforce a preliminary

agreement only to the extent that the parties intend it to be binding." *Id.* at 157.  In order to find

a Type II agreement, the Court must determine that the parties "have agreed to proceed within an

open framework toward a contractual goal." *Id.*  In determining whether the parties intended to

be bound in this manner, the Court must look to "(1) whether the intent to be bound is revealed

by the language of the agreement; (2) the context of the negotiations; (3) the existence of open

terms; (4) partial performance; and (5) the necessity of putting the agreement in final form, as

indicated by the customary form of such transactions." *Id.*

The Court begins with the language of the Agreement to identify to what extent the

parties intended to be bound, as it is the "most important" and sometimes dispositive factor.

*Arcadian*, 884 F.2d at 72.  The Agreement is unambiguous on two points.  First, the Agreement

demonstrates that the parties agreed only to *seek out* a potential financing, not to actually obtain

one.  The Agreement provides that EIG shall have "the exclusive mandate . . . regarding a potential financing" with CNX, "more fully described in the Indicative Terms," which "generally describe[] certain material terms and minimum conditions under which [CNX] and EIG . . . seek to execute the Financing."   Dkt. No. 8-1.  In other words, EIG, a financial services company, is agreeing to "seek" a "potential" financing arrangement for CNX using its expertise, resources, and connections.  This language does not evince an intent to be bound to the "ultimate contractual objective," *Tribune*, 670 F. Supp. at 498, which is obtaining a financing arrangement. Lest there be any doubt, the Agreement expressly states that it "does *not* constitute a commitment of EIG . . . to provide, participate in or otherwise arrange for the Financing or any Alternative Financing with you," and clarifies that "[a]ny future commitment from EIG . . . will be issued only in writing."  Dkt. No. 8-1 (emphasis added).  Thus, this is an agreement to explore a potential financing arrangement, but EIG was not bound to ultimately provide one.

Second, the language of the Agreement demonstrates not only that the parties agreed to seek out a potential financing arrangement, but that they agreed to do so in accordance with a particular framework.   The Agreement states that the "summary of indicative terms and conditions attached hereto . . . generally describes certain material terms and minimum conditions under which [CNX] and EIG seek to execute the Financing."  Dkt. No. 8-1.  Thus, the parties agreed that they would work to obtain a financing arrangement that was generally within the terms and conditions outlined in the Indicative Terms.

This unambiguous language constitutes a Type II agreement.  Indeed, the Agreement is directly on par with the preliminary agreement in *Brown* to develop a commercial property, which the Second Circuit held was a Type II agreement.  *See* 420 F.3d at 158.  The Court reasoned in *Brown* that "while the [contract] does not disclose an intention by the parties to be

bound to the ultimate goal of the contract, it clearly states the parties' agreement to work together to develop, build, market, and manage [the Property] and to work together in accordance with the terms and conditions outlined [in the contract]," and therefore "[w]e cannot imagine more clear evidence of an intention to be bound to the [contract] as a general framework in which the parties will proceed in good faith toward the goal of developing the Property while preserving for later negotiation the specific details of necessary business, design, construction, financing, and management terms." *Id.* (internal quotation marks omitted).

Although the unambiguous language of the Agreement is sufficient to conclude that it is a Type II agreement, "partial performance" also supports this conclusion. The Agreement called for immediate partial performance of CNX, including that it refrain from seeking out any other financing opportunities while EIG attempted to obtain financing (i.e., the "exclusivity period") and that it provide information needed for due diligence. Dkt. No. 8-1. When one party has committed partial performance, it cuts strongly in favor of finding the preliminary agreement to be a Type II agreement, because by "provid[ing] extensive and valuable performance within the framework described by the [agreement]," the party is "entitled to demand [the other party's] good faith in negotiating remaining open terms." *Brown*, 420 F.3d at 158.

Therefore, because the Agreement was a Type II binding preliminary agreement, under New York law EIG was bound to "the obligation to negotiate the open issues in good faith in an attempt to reach the objective," here, a financing arrangement, "within the agreed framework," as set forth in the Mandate Agreement and Indicative Terms. *See id.* at 153 (cleaned up).

In response, EIG makes two primary arguments that the Agreement was not a Type II agreement, neither of which is ultimately persuasive. First, EIG argues, focusing largely on non-binding pre-*Brown* case law, that if the parties left open *any* terms or left any future negotiation

to be done (as the Agreement does) then there is no binding agreement at all.  *See* Dkt. No. 41 at 2-4.  To the contrary, *Brown*, which binds this Court, holds that the existence of open terms "do[es] not warrant against finding [a preliminary agreement] enforceable as a Type II agreement" because "Type II agreements, by definition, comprehend the necessity of future negotiations and contracts."  *Brown*, 420 F.3d at 158.  Therefore, to the extent the district court cases that EIG cite do not accord with *Brown*, the Court may not rely upon them.

And to the extent EIG cites *Arcadian*, a pre-*Brown* Second Circuit case, for the proposition that any open terms or future negotiations indicates no binding agreement of any kind, EIG misreads the scope of the holding.  In *Arcadian*, the parties had created a "memorandum" that outlined a potential sale of a phosphate fertilizer facility, and when the buyer later changed the terms of its offer as a result of the fluctuating phosphate market, the seller sued for breach of contract.   The Second Circuit held that the parties did not intend to be bound to the memorandum (and thus the sale of the facility) because there were "two references to the possibility that negotiations might fail" and a "reference to a binding sales agreement to be completed at some future date."  884 F.2d at 72.  The *Arcardian* Court simply did not address in its analysis whether the buyer had a duty to attempt to negotiate the terms in good faith, even if it was not ultimately bound to the sale.[2]   *Brown*, however, did address this particular issue, and held that while "the existence of open terms creates a presumption against finding a binding contract *as to the ultimate goal* . . . these same omissions may actually support finding a binding Type II agreement."  *Brown*, 420 F.3d at 158 (emphasis added).  Therefore, there is no binding

---

[2] Indeed, in reaching this conclusion, the Second Circuit expressly relied on the framework developed by Judge Leval in *Tribune,* in which Judge Leval stated that "the nature of the contract alleged is that it commits the parties in good faith to negotiate the open terms" and "[t]o consider the existence of open terms as fatal would be to rule, in effect, that preliminary binding commitments cannot be enforced."  *Tribune*, 670 F. Supp. at 499.

precedent to support EIG's claim that, because there were open terms in the Agreement, EIG

owed no contractual obligations of any kind to CNX.[3]  *See* Dkt. No. 34 at 1.

EIG's second argument is that the Indicative Terms document contains language which

obviates any requirement whatsoever to even seek out financing on the express terms.

Specifically, the Indicative Terms document says that "This Summary of Indicative Terms and

Conditions is intended as a proposal for discussion purposes only and should not be construed as

a commitment.  No commitment or obligation hereunder shall exist until such time as the parties

enter into a commitment letter or definitive documentation for the financing contemplated

herein.  The Pricing and terms included herein are based on market conditions on the date hereof

and are subject to change."  Dkt. No. 23-1.

This language is not inconsistent with EIG's obligation in the Mandate Agreement that

EIG seek out financing on in accordance with the Indicative Terms.  Again, the Mandate

Agreement, which is the primary agreement and incorporates the Indicative Terms by reference,

states that the Indicative Terms "generally describes certain material terms and minimum

conditions under which [the parties] seek to execute the Financing," and therefore EIG agreed

not to seek out financing on terms and conditions that were not "generally" in line with the

Indicative Terms (though those terms could be "modified by mutual agreement").  Dkt. No. 8-1.

While the Indicative Terms sheet says it is "for discussion purposes only," that indicates

the terms were created for the purpose of discussions related to the proposed financing

arrangement that EIG agreed to seek out for CNX.  Dkt. No. 23-1.  Critically, the Mandate

---

[3] EIG's argument that the Agreement is non-binding raises eyebrows.  Because "[u]nder New York law, to be valid, a contract must be supported by consideration," *Genger v. Genger*, 76 F. Supp. 3d 488, 498 (S.D.N.Y. 2015), *aff'd*, 663 F. App'x 44 (2d Cir. 2016), EIG must have provided something in return for CNX's alleged promise to pay "out-of-pocket costs and expenses of EIG" to be enforceable.  Dkt. No. 8-1.  If EIG is correct that it "had no 'commitment or obligation' to CNX," Dkt. No. 41 at 1, then that would raise serious skepticism about the viability of EIG's claim for breach of contract brought in its Complaint.  *See* Dkt. No. 1.

Agreement then *expressly* adopted the Indicative Term sheet as the general standard under which it would attempt to obtain financing.  And while the Indicative Terms said that the terms were "based on market conditions" and "subject to change," Dkt. No. 23-1, that is also not inconsistent with the language in the Mandate Agreement, which stated that the Indicative Terms "*generally* describes" the "material terms and minimum conditions" of the potential financing – not that financing would be sought on those exact terms, and also that the "material terms and minimum conditions" could be changed by "mutual agreement." Dkt. No. 8-1 (emphasis added).

In sum, the Court determines that the Agreement unambiguously required that, in exchange for various promises from CNX, EIG would attempt to seek out financing for CNX and that it would do so "under" "certain material terms and minimum conditions" as stated in the Indicative Terms.  Under *Brown*, this language constitutes a Type II Agreement that bound EIG to negotiate the open terms in good faith in an attempt to obtain financing within the framework of the agreement.  420 F.3d at 153.

### 2.  CNX has alleged breach

While the Court determines at this stage that EIG did in fact have a contractual obligation to negotiate in good faith in an attempt to seek out financing in accordance with the general framework in the Agreement and to negotiate those terms in good faith, CNX must also plausibly allege that EIG breached this duty.

"To state a claim for breach of contract for failure to negotiate in good faith, a [claimant] must allege the specific instances or acts that amounted to the breach; generalized allegations and grievances will not suffice." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 431 (2d Cir. 2011) (internal quotations omitted).  Because whether a party was acting in good faith "is ordinarily a question of fact to be determined by the jury or other finder of fact," *Worldwide*

*Servs., Ltd. v. Bombardier Aerospace Corp.*, No. 14-cv-7343 (ER), 2015 WL 5671724, at *18 (S.D.N.Y. Sept. 22, 2015), "the question of whether a party acted in good faith typically is not suitable for resolution on a motion to dismiss," *Gas Natural, Inc. v. Iberdrola, S.A.*, 33 F. Supp. 3d 373, 383 (S.D.N.Y. 2014). CNX must therefore plausibly allege specific conduct from which a reasonable jury or fact finder could conclude that EIG breached its obligation to negotiate in good faith in an attempt to obtain financing within the framework of the Agreement.

While the obligation to negotiate in good faith does not require that parties reach the ultimate contractual objective, it does prevent them from engaging in certain kinds of conduct during the negotiation process. The party must make "a good faith effort to close the deal" and cannot "insist[] on conditions that do not conform to the preliminary writing." *Adjustrite*, 145 F.3d at 548; *see also EQT Infrastructure Ltd. v. Smith*, 861 F. Supp. 2d 220, 228 (S.D.N.Y. 2012). Additionally, "[c]ourts in this District find bad faith when a party attempts to alter the terms on which the parties have already reached agreement." *Worldwide,* 2015 WL 5671724, at *18; *see Network Enterprises, Inc. v. APBA Offshore Prods., Inc*., 427 F. Supp. 2d 463, 485 (S.D.N.Y. 2006) (finding a breach of the duty to negotiate in good faith in a Type II agreement where a party attempted "to obtain an entirely new contract with [the other party] on terms more favorable to" it), *aff'd*, 264 F. App'x 36 (2d Cir. 2008). Moreover, engaging in "dilatory tactics" and making material misrepresentations to the other party can constitute a failure to act in good faith under these types of agreements as well. *L-7 Designs*, 647 F.3d at 431.

"[A]ccept[ing] as true the facts alleged in the" Amended Counterclaim and "drawing all reasonable inferences in favor of" CNX for the purposes of EIG's 12(b)(6) motion, *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012), the Court determines that CNX has plausibly alleged that EIG breached its duty to negotiate in good faith in an attempt to obtain

financing in line with the general framework laid out in the Agreement.  CNX specifically alleges that, after the parties had already finalized an agreement in line with the Indicative Terms, EIG informed CNX that it was insisting on major changes to certain core aspects of the financing arrangement, including on the issues of refinancing existing indebtedness, financing amounts, and reporting requirements that CNX claims EIG knew were "non-starters."  Dkt. No. 32 ¶ 59.  Moreover, CNX alleges that EIG engaged in dilatory or dishonest tactics.  CNX claims that EIG's stated reasons for the changes were pretextual and that EIG's true purpose was to delay informing CNX of the changes until the last minute so that it would be time-pressured into accepting the unfavorable terms.  On the whole, the Court concludes that a reasonable jury or fact finder could determine based on these allegations that EIG breached its duty to negotiate in good faith.

### B.  Implied Covenant of Good Faith and Fair Dealing

CNX also claims that EIG's conduct breached the covenant of good faith and fair dealing.  New York law "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled."  *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002).  But while "[a] party certainly cannot succeed on claims for both breach of an express contract term and breach of the implied covenant based on the same facts," if "there is a dispute over the meaning of the contract's express terms, there is no reason to bar a plaintiff from pursuing both types of claims in the alternative."  *Spinelli v. Nat'l Football League*, 903 F.3d 185, 206 (2d Cir. 2018).  As discussed above, the Court determines at this stage that the terms of the Agreement create a binding Type II preliminary agreement, and that EIG thus had an

obligation to negotiate in good faith.  Therefore, Plaintiff's implied covenant of good faith and fair dealing theory, which is based on the same facts, is duplicative and must be dismissed.

### C. Damages

Damages are an element of a prima facie breach of contract claim, and as such a claimant "must plausibly allege damages resulting from the breach." *Vector Cap. Corp. v. Ness Techs*., Inc., No. 11-cv-6259 (PKC), 2012 WL 1948822, at *8 (S.D.N.Y. May 24, 2012).  Under New York law, "[c]ausation is an essential element of damages in a breach of contract action" and a claimant must "prove that a defendant's breach *directly and proximately caused* his or her damages." *Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525 (2d Cir. 2004).

"A plaintiff is entitled to 'special' or 'consequential' damages 'when they are the natural result of the wrong and when they were within the contemplation of the parties at the time the contract was made.'" *RCN Telecom Servs., Inc. v. 202 Ctr. St. Realty LLC*., 156 F. App'x 349, 351 (2d Cir. 2005) (quoting *Vitol Trading S.A. Inc. v. SGS Control Servs. Inc*., 874 F.2d 76, 79 (2d Cir. 1989)).  Under New York law, "[t]he party breaching the contract is liable for those risks foreseen or which should have been foreseen at the time the contract was made," and while "[t]he breaching party need not have foreseen the breach itself, however, or the particular way the loss came about," the "loss from a breach" must be "foreseeable and probable." *Id.* (quoting *Ashland Mgmt. Inc. v. Janien*, 624 N.E.2d 1007, 1010 (N.Y. 1993)).  However, "damages may not be merely speculative, possible or imaginary." *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000).

In its counterclaim, CNX makes claims for damages in the form of: (1) fees and expenses incurred in the due diligence, negotiation, and document drafting process, including labor costs; and (2) lost opportunities to purchase its 2022 and 2027 bonds at a favorable rate.   Plaintiff has

16

plausibly alleged that it incurred these fees and costs damages as a result of EIG alleged breach of its duty to negotiate in good faith, but not the lost opportunities to buy back its bonds.

### 1. Fees and Costs

CNX alleges that, as a result EIG's breach, CNX incurred substantial fees, expenses, and labor costs associated with negotiation process.  EIG argues that CNX cannot prove causation as to these damages, because even if EIG and CNX would have negotiated and reached a final agreement, CNX would still have incurred those same expenses.  The Court may not so conclude at this stage.  CNX alleges that EIG engaged in bad-faith delay tactics and pushed back closing to the last minute, even after a proper deal had been finalized, to pressure CNX into accepting unfavorable terms.  Accepting that allegation as true for the purposes of this motion, had EIG acted in good faith, then either (1) the parties would have closed on a deal earlier or (2) EIG would have informed CNX earlier on that it was not able to obtain financing.  Either way, CNX has plausibly alleged that it would not have incurred as many fees and expenses as it did in the drafting process.  These are precisely the type of "out-of-pocket costs incurred in the course of good faith partial performance" that "are appropriate" under Type II Agreements.  *L-7 Designs*, 647 F.3d at 431.

### 2. Lost Opportunities

CNX also claims that, had EIG not breached the duty to act in good faith, CNX would have obtained proper financing and thus have been able to take advantage of certain opportunities that would then later arise, including an opportunity to purchase all of its $500 million in 2027 bonds at the available price of 52% face value on March 9, 2020, and another opportunity to purchase its $300 million in 2022 bonds at 79.904% of face value on March 12, 2020.

New York courts look skeptically on claims for lost business opportunities arising from a breach of contract. "Where the damages reflect a loss of profits on collateral business arrangements, they are only recoverable when (1) it is demonstrated with certainty that the damages have been caused by the breach, (2) the extent of the loss is capable of proof with reasonable certainty, and (3) it is established that the damages were fairly within the contemplation of the parties." *Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*, 11 N.E.3d 676, 680 (N.Y. 2014). Claims that a plaintiff could have made favorable investments with money received from a defendant are particularly suspect. *See Meinrath v. Singer Co.*, 87 F.R.D. 422, 426 (S.D.N.Y. 1980)

CNX fails to plausibly allege either foreseeability or causation. It does not allege that EIG (or even CNX) was aware before entering into the Mandate Agreement that favorable bond prices would be available in March 2020. Its only allegation supporting foreseeability is that CNX discussed with EIG that it wanted to secure financing "to provide CNX with liquidity and financial flexibility that would enable it, among other things, to purchase and/or refinance its 2022 and 2027 bonds." Dkt. No. 32 ¶ 19. These plans, so communicated, are too indefinite as a matter of law to establish that damages stemming from a failure to take advantage of favorable bond prices were "fairly within the contemplation of the parties." *Biotronik*, 11 N.E.3d at 680.

Nor does CNX plausibly allege that EIG's breach of the duty to negotiate in good faith "directly and proximately caused" CNX to lose out on these opportunities. *Nat'l Mkt. Share*, 392 F.3d at 527. If a loss is "so remote as not to be directly traceable to the breach" or "the result of *other intervening causes*," it cannot serve as the basis for contract damages. *Id.* at 526. Critically, EIG was not obligated under the Agreement to ultimately provide CNX with financing – at most, the alleged breach resulted in a few weeks delay of the negotiation

period.  CNX's argument that this delay was the direct cause of its inability to make the March 9 and March 12 purchases is far too tenuous and lacking in factual support.  Even accepting CNX's allegations as true, CNX has not plausibly demonstrated that but for this delay CNX would have obtained financing (whether from EIG or elsewhere), that the financing would have been large enough to make both the March 9 and March 12 purchases, and that by March 9 CNX would not have already opted to use its liquidity on other investments.  CNX's claim as to these damages therefore must be dismissed.

Because damages for these lost collateral business opportunities are too remote from EIG's breach, the Court concludes that CNX may not recover them.

### D.  Motion to Strike Jury Demand

EIG moves to strike CNX's demand for a jury, which CNX does not oppose.  Dkt. No. 37 at 17.  That motion is GRANTED.

## III.   CONCLUSION

For the reasons above, Plaintiff's motion is GRANTED IN PART and DENIED IN PART.  Defendant's counterclaim for breach of the implied covenant of good faith and fair dealing is dismissed with prejudice.  Defendant's jury demand is stricken.  Defendant's counterclaim for breach of contract survives, but damages for lost collateral business opportunities are not adequately pled.

This resolves Dkt. Nos. 21, 33.  Discovery will proceed pursuant to the Case Management Plan and subsequent scheduling orders.  *See* Dkt. Nos. 28, 47.

SO ORDERED.

Dated: March 31, 2021
      New York, New York

_____
ALISON J. NATHAN
United States District Judge